United States Court of Appeals for the Third Circuit Oyez! Oyez! All persons and individuals with the honor of the United States Court of Appeals for the Third Circuit are admonished to draw near and give their attention, for this court is now in session. God save the United States and this honorable court. Good morning. We have some, you know, it's not always a happy day in court. We hope it's generally happy, but it's often the case that somebody or others can be disappointed. But today, our business we start with, I hope nobody will be disappointed. Everybody will be happy. We're going to admit some law clerks. So, Judge Smith, why don't we start with yours? All right. Thank you. That means that Sam Statton and Barry Fretsch should come forward at this time, please. Looks like they had been seated almost at 20 paces. There's a reason for that because it hasn't been evident in chambers. Anyway, both of these gentlemen have been with me, of course, since the beginning of last September. They have endured the climate of Altoona during that period of time, brave men, and also forged a friendship that has included outdoor activities and running and so forth. I would have preferred a little bit more jurisprudential, but I appreciate, of course, the need to stay fit, and they have. They've formed great relationships, along with Andre Davis, who is also here, not being admitted. But Sam, being the younger of the two, which is often referred to, a graduate of Harvard Law, and Barry of the University of Chicago, both, of course, have plans, one headed to the private sector, another headed to Mother Justice, the Department of Justice in Washington. So, it's great to have an opportunity to recognize them in the courtroom and to move their admission to the family of the Third Circuit Bar. All right. Any objections, Judge Krause? Seconded. All right. Well, that motion is granted, but before we do the oath, why don't we go ahead and have you introduce your clerks, Judge Krause? Wonderful. Well, if we can add Michael Buchwald, Will Hanover, Maria Labella, and Ben Seymour. Come on up, Bill. You've noticed how friendly we are, so there's no need to pull back. We have had a wonderful adventure of a year together, both with what has passed through chambers and, you know, the various adventures that we've all weathered, literally weathered, including today. As we're told, the building has finally decided to put some filters on the air coming into the building. This should be a great assurance to everybody in the room. But you've been a great crew, and I am thrilled to welcome you into our bar and to have even a small part in launching what will be wonderful careers for all of you ahead. My clerks are hailing from New York and D.C. Michael was at Penn Cary Law School and worked in New York, and will be staying here hopefully for a longer while, but at least for a little while, clerking downstairs for Judge Bailson. Both Will and Maria hail from my alma mater, Stanford Law School, and Will was coming from New York, Maria from D.C., and Will will be also local next year with Judge Beadlestone. And Maria will be headed back to New York, as is Ben Seymour, who is from Yale, and will be going to clerk for a former AUSA colleague of mine, Louis Lyman, on the Southern District of New York next year. It has been a great pleasure, and you will be wonderful assets as we welcome you into the Third Circuit Bar. I move their admission. Okay, very good. I second. All right. Well, before we do the oath, I'll invite my law clerks forward. And I'll introduce you to, from left to right, Christian Bale, Ty Trao, Tom Barr, and Michael Hilliard. Both Ty and Tom are Vanderbilt grads. Christian is from Duke Law School, and Michael is another proud Penn Cary Law grad. We've had a great year together. We really have had a lot of fun. There's been plenty of good humor and teasing, but on the serious stuff, I couldn't have asked for a harder-working, better, tighter team to work with, for which I am profoundly grateful. And I think they know that. One of them is sticking around Delaware, but only one so far. But I think somebody else might come back, so I'm happy to move their admission. Seconded. All right, good. Hearing no opposition, those motions are granted, and I'll ask the clerk to administer the oath. I swear that you will demean yourself as an attorney and counselor of this court, uprightly and according to the law, and that you will support the Constitution of the United States. I do. Congratulations. And now, counselors, you may have your seats, and we'll call our first case. Newkirk, Jim Anderson v. SCI Huntington. Mr. Saylor. You're getting to be a regular. Good to see you again, Your Honor. Thank you for having me back. May it please the Court, good morning. My name is Sam Saylor. I represent Mr. Newkirk, Mr. Ginn, and Mr. Anderson in this case. And if I could request two minutes of rebuttal. That's done. Thank you, Your Honor. The district court's decision to dismiss rather than consider a rind stay in this case for these petitioners put their ultimate federal proceedings in jeopardy. I'm sorry to interrupt so early, but let me ask you, because you phrased the occurrence here just as a failure or refusal to consider, and that's how you argue it in your brief. How do you know that? How do I know that? How do you know that the district court did not consider a sub voce going that route? Your Honor, there was no discussion of the rinds factors below. There was nothing in the response that would indicate that. Right. Nor is there anything in the procedural rules or in the substantive law that would require such an articulation, right? Your Honor, I would submit that this Court's decision ursinoli dictates that the district courts here should have considered a rind stay before dismissal. Well, but that's circular. Since I started by asking how do we know the district court did not consider it, knew certainly that it was a possibility. Let me ask you the question another way, and then I'll drop it. You have not framed your request this way, but are you effectively asking this Court to adopt what we have termed in the past, on a few rare occasions, a supervisory rule? That is, there is, in my view, even taking into account ursinoli, no requirement that options be explained or that even a district judge express on the record this consideration, considerations of stay at a bay. And again, since I've indicated there's nothing I know of in the rules of criminal procedure, are you suggesting that we adopt actually some kind of procedure by way of procedural rule as we have done in a few occasions, on a few occasions in the past? If Your Honor is asking whether it's legal, whether I'm asking for the Court to find that it was legal error for the Court not to consider a rind stay, in this case, yes. The answer is yes. And just to circle back to Your Honor's first question, district courts after ursinoli have applied ursinoli and discussed the rinds factors, saying that the Court in ursinoli put it, that it was, quote unquote, good practice for a district court. Good practice is not the same as a requirement or a rule. Yes, Your Honor, that is true. Which is why I ask, are you effectively asking us to adopt some kind of supervisory rule that would compel or require a district judge to say or do something which, as I understand the status quo, a district judge is not required to say or state? Yes, Your Honor, I am. Can I ask, then, a question that I think may be even preliminary to what Judge Smith has been asking? And that is, why isn't this case moot? This is a case about all three of these petitioners asked for habeas release, saying, release us from prison because COVID is, we're in the midst of a pandemic and our lives are threatened, peculiarly because of our health circumstances in the prison setting, because of the COVID-19 pandemic. And it feels a little bit to me like we are, given the state of the world as it now is, it's like a fellow standing on a pile of cold ashes yelling, save me from the fire. It's over. Why isn't this just over? And there's no meaningful relief that can be given because the relief sought was relief from a peculiarly dangerous situation due to a pandemic, which has ceased. Your Honor, I'll just address that I think the appeal is not moot because it does present this question of whether, in exploring whether it was legal error for the district court to fail to consider. I'm going to get your answer. If the case itself is moot, how can the appeal not be moot? I can understand how there can be a circumstance where an appeal could be moot and the underlying case not be moot, but I can't get my head around an assertion that a case could be moot, but the appeal not be moot. What? I'm not going to disagree with Your Honor that the pandemic is in a different phase right now. It's not just in a different phase. Every government authority that speaks to this has said it's over. The CDC has said it's over. The President of the United States and executive order has said it's over. The Congress of the United States has said it's over. And the Supreme Court of the United States has declared its last pandemic-related case moot and pulled it. So every branch of government at the federal level appears to say it's over. So it's not just we're in a different phase. It's over. I believe all those cases, including this court's opinion in Clark, have to do with orders to limit gatherings to try to make sure that people in indoor spaces are protected or separate enough. Do you agree at least that the case in the district court, the relief that would be requested there on a remand, that that's moot? I do not agree. I think you're going to the second Rhine's factory, Your Honor, whether the case is potentially meritorious. I think that, A, my client's case meets that fairly minimal standard, which is this court in Tarselli v. Green said it is, quote, perfectly clear the petitioner has no hopes of prevailing. Well, it's not that there's no yeah, there's no hope of prevailing for the relief sought, which is I mean, the relief sought is save me from the pandemic. That's explicitly what they were asking for. And there is and the pandemic is is over. It's true that COVID-19 is endemic. It's out there someplace. But according to the numbers given to us by your colleague there across from you are there's it appears there. He hasn't put it this way. So this is me interpolating, but it appears there's no more risk for them in prison than there would be if they went to the mall. Well, I OK. Well, you know, I would say that long COVID is a thing. It is poorly understood at this time. I would say that that, again, if this court would essentially prejudge my client's cases before any briefing or before any actual presentation of that in the first instance in the district court, that would be essentially prejudging every conditions of confinement case that comes before this court regarding COVID at all. And just every case that came and said, stop and save us from the pandemic because the pandemic's over. That's the that's the that I'm. I've carefully read your letter of the 23rd. And I'm not trying to be obtuse. I just didn't understand your assertion that that we've we've still got a live controversy here because there's a legal issue. There may be a legal issue, but factually, the underpinning is just gone. And that's kind of the definition of mootness, isn't it? You know, I think if we are confusing the ultimate success of the case with whether is I'm not talking about the merits, I'm talking about the standard definition of mootness, which is you can't give you can't give any meaningful relief. The meaningful relief they want cannot be given because the conditions pursuant to which that relief was sought no longer exist. That's the that's the that's what your colleague is pressing on the other side. And it's and it's I'm struggling a little bit to understand your response because you keep going to the merits. And what I'm trying to get you to meet is his assertion that you never get to the merits because the case is in the legal technical sense moot. There's no Article three case or controversy left because the facts on the ground have changed. Well, certainly, if this court says that the district court was under no obligation to consider a reinstate, that would extinguish my client's cases. So that's really the nub of the controversy here. That's the merits. So you're going back to the merits. I'm trying to get you to answer. I'm trying to give you a chance to respond to the legal argument. The which isn't a merits argument. It's an Article three case or controversy argument, which is the case is over because the facts on the ground have changed. Do you have a response to that? Your Honor, I can't argue with how the pandemic is being characterized by certain governmental organizations. You know, I don't have an argument there. I would I will just say that in those cases, there are orders at issue from governmental bodies that restrict indoor gatherings. Those are the controversies that are moot there because those orders have been rescinded. In this case, it's it's it's not the nature of the pandemic itself and the risk to individuals such as my clients that have these health conditions. Can I ask you about this another way? Which is that if we even if we accept your argument that as a sort of technical legal matter, there is relief that our court could provide in the remand that you've requested. And we sort of draw from Church of Scientology that that there remains some relief we could provide. If we analyze the state of play such that the relief sought in the district court upon remand is that is not available, that that that it's moot in terms of anything that the district court could do. Why wouldn't we, at least as a matter of futility, even without getting into merits, deny your the request for remand here? Well, I would also just add, Your Honor, you know. OK, so my first response is something I was trying to say earlier was that Mr. Anderson at least does have a pending state petition. So essentially saying that the controversy is moot prejudges even what the state courts would do here. So I think as a matter of comedy. How so? Because how does saying it's moot speak to the merits? Because if you're saying the pandemic has changed entirely and that there is no more risk to anyone, that basically passes judgment on what my client's claim is in state court. Is that is that fair to say? I think that's how I understand it. I understand what you're saying. OK. Well, you know, I'm not trying to jump to the merits, but I do think they're interrelated. Right. I'm not I'm not trying to evade your client. I'm sorry. Your Honor's questions here. But, you know, I would say that the complaints themselves should be taken at face value and they should be judged under a federal civil rule. Fifty six summary judgment standard. Well, is that true? If what if what's being pressed on us is is a jurist, a subject matter jurisdiction point, we are we are presented with a subject matter jurisdiction point, which is you no longer have a case of controversy. And here are the facts associated with that. Can you rely on the truth of the matter asserted in the habeas petition as a basis? Or do you not have to come forward and meet that with some sort of factual foundation to say, no, you still have subject matter jurisdiction on the basis of these facts? As I understand rule 56, this court must assume all excuse me, all 50 pleaded facts as true. It's not a rule 56 issue. It's a 12 to one issue. It's a 12B1 issue saying you don't have subject matter jurisdiction. This case is moot under our 12B1 law. As I understand it, if there's a factual assertion that we lack jurisdiction because of, for example, mootness or a lack of standing or something like that, the obligation on the person invoking the jurisdiction of the court is to come forward and say, here are the facts that demonstrate you have it. It's not, we're not assuming the truth of anything. We're actually called in the first instance to assess the truth of the factual circumstances, aren't we? Well, I think that's a pretty minimal standard in this case in which my clients have pled that there are, that's, excuse me, about the impossibility of social distancing in the showers, the makeshift infirmaries everywhere, the wave after wave of positive cases. I agree this is from two years ago. And, you know, I can't supplement the record before your honors. I was appointed on appeal. I mean, I think I'm a little bit constrained by what I'm allowed to do here on appeal. But I do think essentially prejudging my clients' cases based on what the executive branch has done regarding its orders, I think misses what the controversy is here. And what my clients seek to do is to get back to where the district court actually dismissed, because if they can't do that, then the case is over anyway because they, you know, have statute of limitations problems. Okay. Understood. Thank you very much, Mr. Sale. We'll have you back on rebuttal. Thank you. And we'll hear from Mr. Eisenberg on behalf of the Commonwealth's parties. May it please the court. Ronald Eisenberg for the respondents. I'd like to start by noting the COA question in this case, which was whether the district court should have stayed the petitions under Ryan's, not whether the district court should have considered staying, but whether it should have stayed. And the answer is that the court not only shouldn't but couldn't have stayed the petitions because they don't meet the Ryan's test. And even if they had then, they don't now because the case is now moot. I'm a little surprised that you don't start with, hey, you shouldn't be talking about this case at all because it's moot. Because that's your point in your letter, so I'm surprised you start with the merits. How do you reconcile that with Church of Scientology? The question there was whether there was relief left that could be provided to the defendants, to the claimants. And there wasn't, and there isn't here. What the claimants asked for here, what the petitioners asked for here was to be released from prison until the pandemic was over. And the pandemic is over. And so it's no longer possible to provide them the relief that they asked for. But the relief, you're going to the merits of what they've asked for in the district court. What they've asked us is to require that the district court consider various factors for Ryan's stay. Why isn't that consistent with Church of Scientology, a relief, a request for a kind of relief that's distinct from the relief that they're asking for in the district court? Well, I agree with Judge Jordan's comment that if the entire underlying controversy is moot, then that sort of procedural relief is also moot. And it would be dictum to address in this case whether the petitioners are entitled to consideration of Orion's stay, both because of mootness and because they can't meet the requirements for Orion's stay. Well, we might still affirm based on futility of remanding. But isn't there a difference between looking at this as a matter of futility because of the nature of the relief that we see them seeking in the district court versus saying that when they've requested from us a mandate that the district court consider factors or articulate consideration of factors that it didn't. That's relief that we might still be able to provide as a technical matter. Well, I certainly think there's a difference between futility and mootness, Your Honor, which is why I've addressed both today and in my supplemental brief. But putting mootness aside for the moment to focus on this question of futility, as I said, the question in the COA was whether the court should have stayed. And we therefore have addressed, as did the petitioner in the brief for appellant, whether the court could have granted Orion's stay here. And the answer is no. The court couldn't have granted Orion's stay. And the primary reason why is because of the absence of any allegations amounting to deliberate indifference. And the petitioner has argued, I think today and in his briefs, well, he's sidestepped the question of deliberate indifference. And he said, yeah, but I might be being harmed. There might be risks to me from being in prison. That may be true, but it doesn't account for the separate element of his claim, of their constitutional claims, which is deliberate indifference. That's why this court and the district courts in this circuit have repeatedly dismissed on their face COVID prison allegations that didn't assert any facts, which, if taken as true, if assumed to be true, could possibly amount to deliberate indifference. That's what the court did in Hope, for example. And that's why there's no possible Orion's stay here and why the question in the COA, should the court have stayed, has to be answered in the negative. It couldn't have stayed. Let's back up to the threshold question that perhaps it's morphed into as a result of the briefing. And that is, is there, and should we take from our own precedent that there is a, whether we consider a supervisory role or we simply call it, you know, an abuse of discretion. If a district court does not sua sponte raise and address Ryan's factors. That is the supervisory rule question, Your Honor. And as I said, if the court were to address that here, it would be dictum. And there are dangers in dictum. And I'd like to turn to the Ursinoli case, which the court has asked about and my colleague has addressed. When the petitioners argue that Ursinoli requires the district court to consider Orion's stay, they're relying on one sentence in Ursinoli. It's the second to last sentence. Nothing else in the opinion addresses that particular question. And it's clearly dictum there. Those circumstances were not presented there. And one problem with that dictum is that I believe that it contradicts Plyler v. Ford, which was a case about whether courts had to consider and give warnings to a habeas petitioner about whether to, how to, what to do with a mixed petition. Well, that's a, was Plyler dealing with the circumstance where a federal right was going to be put in jeopardy if some warning were not given? It was, I think that's, it's arguable that it was. What we're going to say more specifically about Plyler, Your Honor, is that the warnings in question that the court said could not be required of a district court, the consideration in question, weren't just about exhaustion and mixed petitions. They were specifically about stay and obey. The warnings in question in Plyler were a Ninth Circuit supervisory rule requiring district courts to tell defendants in a mixed petition context, petitioners in a mixed petition context, what they had to do in order to get stay. We're familiar with Plyler. Does it make a difference that this is not a mixed petition? Yes, it does. That makes it even more distinguishable, Your Honor. Because? Because there's no choice that the defendant, that the petitioner has as he has in a mixed petition case. And in the mixed petition case, and I think Ursinoli, the bulk of the opinion before the dicta at the end, emphasizes this point. In a mixed petition case, the petitioner has to decide between dismissal and deletion. And that's really the petitioner's decision, not the court's decision. Well, isn't that exactly why it actually cuts the other way that we're dealing with entirely unexhausted claims? Because that same risk of being construed as legal advice is far less where there's only one option. No, Your Honor, because there's no right to a rind stay. A rind stay is completely within the discretion of the court. So the argument in Plyler that you have to warn the petitioner or at least consider those options, the argument in Ursinoli that the petitioner had to be, his right to choose had to be preserved, does not apply when it comes to a rind stay. And the court in the rinds context is just giving the petitioner the same kind of legal advice that a lawyer would. There are many tactical considerations, many motions or requests that any litigant might make. Well, it's a different question whether it's raised and argued. It's still in the court's discretion whether to grant it or not. But we're talking about just the threshold question of whether the issue is raised such that the court could be presented with arguments on both sides before it exercises its discretion. Yes, we're talking, I think, Your Honor, about whether courts must be required to consider the rind stay sua sponte. That's what we're talking about. I believe that the answer is no. I believe that a rule to that effect would be the equivalent of the supervisory rule in the Ninth Circuit in Plyler that the Supreme Court overruled. Does that mean a court, district court, does not have the ability to consider a rind stay? Of course the court has the ability to consider a rind stay. It just doesn't have the obligation to do so. How can we know whether a court considered it or not and review its exercise of discretion for abuse of discretion if there's nothing articulated in the record at all? Well, that would be true of any number of issues that the court doesn't address and that the parties didn't raise before it, Your Honor. There was no request for a rind stay here. The court dismissed at the Rule 4 stage, as is commonly done in these cases, and there's – I don't think there's any way of getting around the point. Was there even an exercise of discretion where there has been no request by a party or counsel for a party here? They're uncounseled. Raising an obligation of the court to do something or not do something. I think it's unclear, Your Honor, but lest there's some underlying requirement. But why? Were two of the supervisors a rule or something that's already in a rule of procedure? And there certainly wasn't here in these cases. And were the court to create one here. The question is, does Ursinoli create that already, right? That seems to be the position that you're calling, Mr. Saylor. Yes, Your Honor. Does it create it already? My answer to that, Your Honor, is that Ursinoli is dicta, so it does not. Is it treated as dicta by a bunch of district courts across the circuit? That's hard to say, Your Honor, because courts would have the right to choose to consider the rind stay even if Ursinoli hadn't asked them to. And in addition to being dicta, I think, as I said, it's inconsistent with Plyler. But I think these are complicated questions. These Ursinoli questions, Plyler, Day v. McDonough, Bendolph, all of these raise complicated questions involving a number of Supreme Court cases and how they interact with this circuit's cases that are perhaps not best answered in a case like this one, which is, number one, moot, and number two, unavailable for rinds relief in any case. Since there was no stay requested, does that affect our standard of review here? What's the standard of review? Well, it's hard to say, Your Honor. The COA question was crafted by the court, not by any of the parties. Well, I'm not asking what the COA question was. The case is in front of us. What's our standard of review? If the parties had asked and if there were a requirement the court consider, then the standard of review would be abuse of discretion. Given that the parties did not ask and that, in my view, there was no non-dictum requirement that the court consider, I'm not sure what the standard of review would be for that, Your Honor. If there had been a request under those circumstances, would your answer be different about what a district court would be required to articulate? If there had been a request, then the court would have had to rule on it. I don't think that there's, and I think Judge Smith's questions earlier were getting at this, I don't think there's a requirement under any reading of any of the precedents that the court not only consider but address on the record or in an opinion his full reasoning for any particular decision. And that's, in effect, what we have here. We will often remand where there's, we can't, there was an explicit denial of a request that was made, but we can't ascertain whether the court actually addressed the factors that we've identified as relevant. But there's no getting around the futility problem, Your Honor. If the court couldn't have granted a rind stay on the facts as alleged, then it's not appropriate to remand to ask the court to conduct a futile act. And this court has regularly dismissed at the pleading stage COVID prison claims that didn't have any facts that would amount to deliberate indifference. And it's not surprising that they don't, because these are COVID habeas claims, and a COVID habeas claim has to be a claim for release, which has to mean that nothing else can work. The prisoners might not have been doing anything wrong in how they're handling the medical emergency, but it's not good enough, and therefore we have to be released. Are you suggesting that we, that hope is not good law? No, I hope exactly reached that conclusion, that I'm not making a jurisdictional point here. I'm making a point about deliberate indifference, that if release is the relief sought on the ground, and that the prisons couldn't have done anything else but release to remedy the conditions, then it's going to be hard to say that the prisons acted with deliberate indifference. They did nothing that amounted here to deliberate indifference, neither in this case nor in any of the other cases that this court and district courts have dismissed on the same facts. And in the same way that the court doesn't overrule a lower court for denying leave to amend a complaint, where no amendment could state a claim on its face, for that same reason, the court couldn't and shouldn't remand here to have the district court consider whether to apply a rind stay or not. That's a futility argument. Yes, it is, and as I said, that's part of our position. Now, the petitioner has pointed out that just a couple of months ago, one of the petitioners, Anderson, filed a new state habeas petition for the first time in state court trying to address a COVID claim. And the problem with that is that if the petition, and I just saw it for the first time the other day, it's very short. If the petition is referring to the same conditions that are the subject of this case, then it's moot, and I would suggest dilatory because those conditions have changed. If it's a new claim about new current conditions, then it's not about this case at all. It's irrelevant to the mootness questions here, and it doesn't present any of the same problems because if the conditions are new, if the problem is new, then all the time bar issues are completely different. And again, rinds wouldn't apply in any case in that situation, and nor does this get around mootness. The court held in Clark and Stepien that in order to avoid – oh, I'm sorry, Your Honor. Yeah. I see that my time is up. Yeah, give you just a moment to wrap up. To avoid mootness, the petitioner must claim, must present, must have the burden of proving that the same precise situation is re-arising or will re-arise. And as Stepien said, the same precise controversy, that's not happening here. All right. Thank you, Mr. Weiser. Mr. Saylor. Your Honor, just a few points on rebuttal here. My colleague from the Commonwealth addresses the deliberate indifference. I think my clients' petitions themselves do spell out this deliberate indifference, and they should be liberally construed because they are pro se proceedings, and that's the only briefing that's happened at the district court. So with some sort of order to respond and further briefing, perhaps counseled, that could also flesh out some of these issues. But at a bare minimum, they certainly have addressed the deliberate indifference standard about the virus running unchecked, about people being on the same floor as – Yeah. Well, here's the problem with – maybe you can help me out with this. RINES seems to create a sort of a loop that's tough for me to think through. As we described it in Heleva, we said the RINES requires – to get a RINES stay requires three things. First, you've got to show good cause for the failure to exhaust the state to start with. Second, you have to have a potentially meritorious claim. And third, no dilatory behavior. So we give you the first and the third fine. It appears that to get a RINES stay, you have to show you've got a potentially meritorious claim. If it's futile, how can it be potentially meritorious? I think by – I'll return to an answer that I said earlier, which is essentially if this court finds that there's absolutely no merit at all because of an executive order by the Biden White House, then I think that's the wrong – Ignore the executive order from the Biden White House. Just take it that what we're dealing with is a statement from the other side that there has been – there have been no deaths and zero cases for the last six months or more since the briefing concluded in 2022. And before that, a 0.05 or something like that death rate within the prisons. Certainly, it doesn't appear anything more significant than in the general population for the entire year before that. So it's not a function of an executive order. It's a function of a statement of fact from the other side. If we said there's – that's the only information we've got to go on, it appears that not staying out of, you know, whether it could have, should have, would have, whether it's in fact a futile claim, even if not moved, how can that be a potentially meritorious claim? That's the only information we have to go on because, you know, my colleague is offering essentially facts that I can't dispute because we're on appeal here. You know, it should be easy enough for a district court in the first instance to basically measure facts against each other and say, okay, look, there's not enough merit here. But what I'm arguing is that it would be inappropriate for this court at this moment with this level of briefing to actually prejudge my client's claims entirely. Understood. Any questions? All right. Thank you very much, Mr. Sarah. Thank you, Your Honor. Mr. Eisenberg, we've got the matter under advisement.